RESPUBLICA *against* ABERILLA BLACKMORE.

[S. C. Addis. 284.]

A citizen of Maryland, purchasing lands in Westmoreland county, in March 1780, but not actually residing thereon with his slaves till December following, has not the benefit of registering his slaves under the act of 13th April 1782, but they are entitled to their freedom on being brought into the state.

A *HABEAS CORPUS ad subjiciendum* was issued to the defendant by Alexander Addison, esq. president of the courts of the Common Pleas of the Fifth Circuit, to bring before him Cassandra and Lydia two negro women.

The writ was returned before him and then removed by *certiorari* into the Supreme Court. The return was as follows: "In obedience to the within writ, I have here Cassandra and Lydia, as within required and as to the cause of their being taken and detained, I certify and return, that the said Cassandra and Lydia, negro women, were slaves to my deceased husband Samuel Blackmore, in the state of Maryland, where he lived, and they with him as part of his family, before and in the month of March 1780 ; that in the same month, he came into the then county of Westmoreland, in the state of Pennsylvania, to purchase land, and on the twenty-fourth day of that month purchased a tract of land, then in the said county of Westmoreland but now in the county of Washington, and state of Pennsylvania for 22,000*l.* continental money, and gave his bond for this money, which he afterwards paid ; that, returning to Maryland where his family still remained, he told one of his neighbors, who was then about to remove, and in April 1780 did remove

from thence into the said county of Westmoreland, that he should have a certain part of his land, and bid him put in a fall crop, if he did not get there in time himself ; he also gave him apple trees to plant, and said he would be out there himself in September following: that the said Samuel Blackmore, having sold his land in Maryland about the middle of December following, and not before, arrived with his family on the land which he had bought, then in Westmoreland, but now in Washington county,in Pennsylvania, bringing the said Lydia then with him, and the said Cassandra having been sent up about two weeks before with two of his sons : that the said Samuel Blackmore from that time until his death, continued to reside on the same land with his family, keeping the said Cassandra and Lydia, part of it, as slaves : that an act to redress certain grievances within the counties of Westmoreland and Washington, passed on the 13th April, 1782, enabling certain inhabitants of those counties to register their slaves, he the said Samuel Blackmore registered the said Cassandra and Lydia with the clerk of the peace of Washington county, on the nineteenth day of December 1782, by virtue whereof they were and are claimed aad held as slaves, in the state of Pennsylvania ; and this is the cause of their being so taken, kept and detained.

"ABERILLA BLACKMORE."

The entry by the clerk of the peace of Washington county, was in the following words and figures :

" December  19, 1782,  Samuel  Blackmore, of          township,
          " enters in the sessions,
          " Cass, a negro slave, aged 22 years,
          " Liddy,  ·  do.      do. 20  do."

The original return in writing could not be found.  This return was argued by consent at Nisi Prius.

Mr. Brackenridge for the claimant, admitted that on elementary principles, slavery itself might be questionable under the first section of the 9th article of the state constitution, which declares that " all men are born equally free and independent." (3 Dall. Laws, XXXIII.) But the same clause guards and secures property, and regards the right of acquiring, possessing and protecting it, as inherent and indefeasible.  The slaves among us were no parties to this compact.  The general practice of mankind, in most of the civilized ages of the world, evinces that there may be a property in slaves, which in this state is not abolished, but only restricted *sub modo*.  The act for " the

gradual abolition of slavery," passed on the 1st March 1780, (Dall. Laws, 838,) is not penal, but remedial, and shall be construed liberally for the owners. The 5th section thereof, as to the registering of slaves, before the first day of November then next, is merely directory. The negligence or mistake of a ministerial officer, shall not affect the fair and honest holder of slaves. If he omits on record, the occupation or possession of the owner, the name of the county or township, the sex of the slave, or is incorrect in the orthography of his or her name, it shall not be imputed to the owner. Here the written paper delivered by Samuel Blackmore to the clerk of the peace cannot be found ; and it is therefore impossible to ascertain whether the imperfection of the entry arose from him or the proper officer.

The agreement between the commissioners of this state and Virginia, dated 31st August 1779, though acceded to by a resolve of the legislature on the 23d September 1780, was not finally confirmed until the passing of the law on the 1st April 1784. (2 Dall. Laws, 207.)

The northern boundary of this state being unascertained, persons coming to reside on the frontiers, were within all the mischiefs of a dubious jurisdiction. Samuel Blackmore was a free-holder, *adscriptus glebæ*, on the 23d September, 1780, and could not be expatriated without his own consent. In March preceding, he actually came into Westmoreland county, and purchased lands therein, and in the month of December following, resided thereon with his family. Might he not then be deemed an inhabitant of Westmoreland county on the 23d. September 1780, within the second and third sections of the act of 13th April, 1782 ? (Loose Acts, 60.) But, is it certain, that the word "inhabitants" in the third section, refers to the period of 23d September 1780, and not the 13th April, 1782 when the act passed? The general words of the preceding section, clearly relate to the class of inhabitants at the time the law was enacted, and the word " such," in the section under consideration, is a term of relation. It is however admitted, that the masters must have been possessed of such slaves on the 23d September 1780, though it is not necessary that such slaves should have been personally resident within the state. When Blackmore brought his lands, he could not know whether Pennsylvania would ratify the agreement made by the commissioners of the two states ; but when the law of 1782 passed, he availed himself of the proffered redress, and registered his slaves within the term prescribed by that act. Consequently, he has done all in his power to comply with the laws of the country, and secure his property in these negroes.

Mr. Ross for the negroes, asserted, that he was under no necessity of recurring to elementary principles, to show that they were entitled to freedom, " Heaven's best gift." Even admitting the morality and legality of human slavery in certain instances, and that " a difference in feature or complextion," may sometimes constitute a distinguishing line between perfect liberty and absolute vassalage, it is presumed, the present applicants are emancipated from their former bondage by the benignity of the laws. The court will entertain no leanings between " the different works of an Almighty hand ;" essential justice respects not suitors of a white, tawny or black color. But if a distinction must necessarily be set up, it ought infallibly to be in favor of liberty.

The objects of the legislature are distinctly marked in the act of 1780. It utterly abolised all slavery for life as to persons born within the state, after the passing of the law, and declared that all owners of negro or mulatto slaves, or servants for life, or till the age of thirty-one years ; then within the state, should register them in a certain pre-scribed mode, on or before the first day of November following ; in default whereof they were entitled to freedom. Whoever therefore was desirous of holding his fellow creature as a slave, must show his conformity to the directions of this law. No slave could be intro-duced into the state, after the passing of the act. The number of slaves either by importation or procreation, could not be increased.

The omission of regular and precise entries tends to defeat the in-tentions of the legislature, by introducing uncertainty and confusion. Persons of the same name holding slaves, may have different occupa-tions, or reside in different townships in the same county. Here the county, township, and occupation of the owner are omitted, as well as the sex of his unfortunate slaves. "Cass" may represent "Cassius" equally as "Cassandra," and signify the name of either man or wo-man. Taking it therefore as granted, that Samuel Blackmore was an owner of these women as slaves, and that they were even within the state, on the 1st March 1780, they can no longer be considered as servants for life, for want of being duly and regularly registered, un-der the express provisions of the fifth section of the act for the gradual abolition of slavery. Nothing can be inferred from the want of the written paper, supposed to have been delived by Blackmore to the clerk of the peace. It is possible that such paper was not delivered, but that the return was made *ore tenus*. If it was delivered, it is fair to presume, that the entry of the clerk, pursued it *verbatim et lite-ratim*. The latter could have no interest or inducement to vary from it.

It is not however conceded, that Samuel Blackmore was the owner of these negroes within the state, on the 1st March 1780, or an inhabitant of Westmoreland county, before the middle of December in the same year. The act of 13th April 1782, considered as perfectly unexceptionable, extends only to cases where the jurisdiction was questionable, in the counties of Westmoreland and Washington. Blackmore lived in Maryland, where the jurisdiction was known and defined. He had no slaves within this state on the 23d September 1780, when the agreement made by the commissioners on the part of the states of Virginia and Pennsylvania was finally and unanimously confirmed by a resolve of the legislature, as is specified in the recital of the act of 13th April 1782.

This is the ultimate period to which indulgence was meant to be extended, or pretended grievances redressed. A fluctuating jurisdiction within the disputed boundaries was reduced to a settled state. In 1784, a law passed with a conformatory clause of the agreement between the commissioners. But the contracts and mutual cession was previously completed, and needed no addditional sanction. The county of Washinton was erected in 1781.

. It has been urged, that Blackmore was *adscriptus glebæ* in March 1780. Does this make him an inhabitant, within the accurate intent of the law ? Would foreigners, entitled to lands within this state, or the citizens of sister states, holding lands here by their tenants, be deemed inhabitants of this state ? Could either description of persons, resident under other governments and laws, deluge the country with a flood of slaves, within the meaning of the law, whose professed object was " to extend a portion of that freedom to others, which had been extended to us ? Nor can it reasonably be asserted, that the *animus residendi* will constitute an inhabitancy. It must be an actual residence, a *possessio pedis* which alone can effect it.

The construction of the act of 13th April 1782, is plan and obvious. Such persons as were actual inhabitants of the counties of Westmoreland and Washington on the 23d September 1780, within the disputed territory between Virginia and Pennsylvania, who were then possessed of negro or mulatto slaves, or servants for thirty-one years, on registering such slaves or servants, agreeably to the directions of the law for the gradual abolition of slavery, were entitled to retain them in their service. No others could assume the extravagant right of holding their fellow creatures in slavery.

Yet more must be urged in favor of these women. I confidently assert that the act of 13th April 1782, so far as it respects

unfortunate slaves for life, or servants till thirty-one years of age, is unconstitutional. It contains a most extraordinary principal. It effects to return back to a state of slavery certain human beings, who were legally free. Will it be said, that the legislature at their pleasure can transmute a freeman into a slave, by directing the performance of a few ceremonial acts? Whether the parties are white, tawney or black, can there be any possible distinction?

The people of America are the real sovereigns of the government. They are represented by the executive, legislative, and judicial branches; but each branch is limited by the boundaries of the constitution. When the legislative authority infringes on the judicial, their acts cease to be the will of the community, and the judiciary will be prompt in declaring their opinions thereon. The judges of the Supreme Court of the United States have declared an act of congress concerning the invalid pensions to be unconstitutional, and thought themselves bound to refuse to execute it. The constitutionality of the act, laying a duty on carriages, has been fully discussed and considered in the same Supreme Court.

The act of 13th April 1782, professes to redress certain grievances, but it goes much further. Negroes and mulattoes within the limits of the state, emancipated by the law of 1780, could not be thrown back into slavery without their full and free consent. But could even such consent be binding on them? It has been said, they were no parties to the constitution of the state. Will it now be said, they were parties to this obnoxious law? Put the case of a military man, who had nobly fought for his country during the war, in captivity when the act of 1st March 1780, passed, and his family or attorney had neglected in his absence to register his slaves as that law directs, whereby they became free. Surely this would be a certain grievance and hardship! But it will not be seriously asserted, that the legislature of this commonwealth could interpose in such an instance, and doom these unfortunate people of color again to slavery, by an arbitrary edict, without their participation, or without delinquency on their part! The public purse might be opened for the complete redress of such a grievance, but the liberty of the former vassals should be preserved inviolate.

On each of the different grounds stated, it is humbly presumed, that these unfortunate negroes will be at length liberated fron their imprisonment.

By the court. The argument on the return to this *habeas corpus* has been conducted with singular ingenuity. Several important points

have been made, on all of which it appears to be neither necessary nor eligible to deliver our opinions.

It is of great consequence to the community, that the decisions of courts and judges, on this subject particulary, should be uniform. We have no difficulty in saying, that Samuel Blackmore was not an inhabitant of Westmoreland or Washington counties, within the true meaning of the acts of 1st March 1780, or 13th April 1782, at the times required by either of those laws; and likewise that the negroes not being within the disputed territory, or even within the state, at either of those times, they could not afterwards be introduced as slaves. We are therefore of opinion, that Cassandra and Lydia are to be deemed free women, and discharge them from the custody of Aberilla Blackmore, the defendant.